IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THERESA PLOTNICK,　　　　　　　：

　　　　　Plaintiff,

　　　v.　　　　　　　　　　　　：

DAYTON PUBLIC SCHOOLS,

　　　　　Defendant.　　　　　：

Case No. 3:21-cv-248

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, DOC. #27, AS TO COUNTS ONE AND
TWO AND DECLINING TO EXERCISE SUPPLEMENTAL
JURISDICTION OVER THE STATE LAW CLAIM IN COUNT THREE;
JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST
PLAINTIFF AS TO COUNTS ONE AND TWO; COUNT THREE
DISMISSED WITHOUT PREJUDICE TO REFILING IN A STATE
COURT OF COMPETENT JURISDICTION; TERMINATION ENTRY

---

This matter comes before the Court on Defendant Dayton Public Schools'

("DPS") Motion for Summary Judgment. Doc. #27. Plaintiff Theresa Plotnick has

filed a Response in Opposition, Doc. #32, and DPS has filed their Reply in Support

of Motion for Summary Judgment. Doc. #33. For the reasons below, Defendant's

motion is SUSTAINED as to Counts One and Two. Count Three is DISMISSED

without prejudice to refiling in a state court of competent jurisdiction.

**I.　　Procedural Background**

Plaintiff Theresa Plotnick ("Plaintiff" or "Plotnick") filed suit against DPS on

September 8, 2021, and asserted three claims: discrimination under the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.* (Count One); retaliation

under the ADA (Count Two); and a state law claim of discrimination under O.R.C. § 4112.02 (Count Three). Doc. #1.[1] After seeking—and being granted—leave to proceed *in forma pauperis*, Doc. ##2 & 3, and after a stipulation by both parties allowing Defendant an extension of time to respond to the complaint, Doc. #9, DPS filed its Answer on February 1, 2022. Doc. #11. After approximately 18 months of discovery, DPS filed the instant Motion for Summary Judgment, Doc. #27, on August 30. 2023. Plotnick's Unopposed Motion for Extension of Time to File a Response/Reply, Doc. #29, was granted on September 21, 2023, Doc. #30, and the discovery phase concluded the following day. Doc. #31. Plotnick filed her Response in Opposition on October 12, 2023, and DPS filed its Reply on October 24, 2023. The motion is now at issue.

## II.    Factual Background

In July of 2019, Plotnick interviewed with DPS for a one-year position Teaching English to Speakers of Other Languages ("TESOL") for the 2019-2020 school year. Plotnick Dep. at 57, Doc. #24 at PageID #116. During the interview, which included Amy McKinney-Janev ("McKinney"), the Senior Academic Coordinator of DPS' English Learner Services, *id.* at 58, PageID #116, Plotnick was told that TESOL teachers had caseloads of up to 75 students. *Id.* at PageID #117. Plotnick accepted the job teaching at Belmont High School ("Belmont") by agreeing

---

[1] This Court's jurisdiction is based on federal questions "arising under" the Constitution or laws of the United States and supplemental jurisdiction of related claims that are a part of the same case or controversy. 28 U.S.C. §§ 1331, 1367.

2

to a contract starting on August 5, 2019, Doc. #1, PageID #2, with the students'
first day of school falling on August 12, 2019. Plotnick Dep. at 67, Doc. #24,
PageID #118. Plotnick reported to Dr. Donetrus Hill ("Dr. Hill"), Belmont's Principal,
and Karen Spaulding-Chicketti ("Chicketti"), Belmont's Assistant Principal. *Id.* at
65, PageID #118. Plotnick did not mention her medical condition to McKinney or
the other interviewers prior to accepting the contract, *id.* at 63, PageID #117, nor
did she mention it to Dr. Hill or Chicketti at the start of her contract. *See generally*
*id.*

After starting at Belmont, Plotnick was told by DPS that there was an empty
teaching position for Sheltered English Language Arts ("Sheltered ELA") and that
she would be teaching that instead of TESOL. *Id.* at 70, PageID #119. The position
would require Plotnick to teach ELA to students of all grades who speak English as
a Second language (hereinafter referred to as "ESL students"). *Id.* at 72, PageID
#119, but because Belmont had many ESL students, Plotnick's Sheltered ELA
caseload would be much higher than the TESOL caseloads. Plotnick Dep. at Ex.
11, Doc. #24-1 at PageID #243. With this change in workload and teaching
situation, Plotnick attempted to work with the resources provided by DPS.
However, she felt they were too advanced for the current level of her students.
Plotnick Dep. at 76, 79, Doc. #24 at PageID #120–121. Plotnick informed
Chicketti of this issue and her need for new materials, and while Chicketti
responded that DPS would get her better materials, Plotnick never told Chicketti
what books or materials she wanted. *Id.* at 81–82, PageID #122. At this time,

3

Plotnick did not tell Chicketti that she had any medical conditions, nor did she request that any accommodations be made for her specific needs. *Id.* at 96–97, PageID #125–126.

On August 22, Plotnick emailed McKinney—one of her interviewers and DPS' Senior Academic Coordinator of English Learner Services—to lay out her complaints about the lack of support she had in the classroom, specifically how she had no paraprofessionals or classroom aides, her classes were comprised of students at various and disparate levels of literacy and general education, and that the provided textbooks were too advanced for many of her students. *Id.* at 91, PageID #124; Ex. 8, Doc. #24-1 at PageID #230–232). A relevant portion of Plotnick's email stated:

> I could differentiate for such completely diverse students, if only the group sizes were smaller. Or I could manage the enormous class sizes, if only they were all around the same level. Or I could split my massive groups into smaller workgroups and spend 10 minutes working with each group while the others quietly work independently . . . if only I had some kind of ready-to-go-out-of-the-box curriculum/materials that I could use . . . but right now, it is the worst combination of circumstances.

*Id.* McKinney responded with an email and a phone call promising help with Plotnick's situation. *Id.*; Plotnick Dep. at 99–100, Doc. #24 at PageID #126. At this time, Plotnick made no mention of her medical condition, nor did she request any personal accommodations. *Id.* at 101, PageID #127.

Shortly after Plotnick's phone call with McKinney, on August 27, 2019, Dr. Hill and Chicketti came by Plotnick's classroom to speak with her about her

4

conversations with McKinney. Plotnick Dep. at 110, Doc. #24 at PageID #129. After Plotnick explained her concerns about textbooks, class sizes, and the students' various reading levels, Dr. Hill told her he understood why she went outside of Belmont for help. *Id.* at 111, PageID #129. However, he also told her next time she should "come to [him] and we'll solve these things," *id.*, and Chicketti reminded Plotnick that she already agreed to provide her with the textbooks she wanted. *Id.* Plotnick did not use this opportunity to mention her medical condition or request any accommodations during this conversation. *Id.* at 117–118, PageID #131. While Plotnick would get permission from Chicketti later that day to take the rest of the day off because she was "afraid that [she] would be hospitalized and too sick to continue working," *id.* at PageID #131, this was the first time Plotnick had told anyone at DPS that she could be hospitalized, and she did not mention her specific medical condition. *Id.* at PageID #132.

Later that same day, August 27, 2019, Dr. Hill set up a meeting after school to discuss a way forward with the ESL program. Plotnick Dep. at 123–124, Doc. #24 at PageID #132. Participants at the meeting included Dr. Hill, Chicketti, Belmont counselors, and the two TESOL teachers. *Id.* Despite taking part of the day off, Plotnick also chose to attend, and she secretly recorded the meeting on her phone. *Id.* at 124–125, PageID #132-133. During the meeting, Dr. Hill informed the group that DPS was hiring a bilingual paraprofessional to help in Plotnick's classroom starting the following week. *Id.* at 126–127, PageID #133. Dr. Hill also stated that DPS was hiring a third TESOL teacher, and while the

5

TESOL teachers would end up having around 75 students, Plotnick, as the
Sheltered ELA teacher, would still have a higher caseload due to the overall
population of ESL students at Belmont. *Id.* at 130–131, PageID #134. Despite this
difference in student caseloads, Dr. Hill told Plotnick that DPS would be working
on drawing down her class sizes to around 20 students and would be "leveling"
the rosters so each class would not have widely disparate proficiency levels. *Id.* at
127–128, PageID #133. Additionally, Dr. Hill told Plotnick that McKinney had
more materials for her, *id.* at 132, PageID #134, which Plotnick claims made her
"ecstatic" because "that was the number one thing [she] wanted." *Id.*

At the end of the meeting, Dr. Hill spoke about how these changes meant
Belmont would be moving in the right direction, however the school "had to take
[their] time to do it right." *Id.* at 129–130, PageID #134; Ex. 10, Doc. #24-1 at
PageID #242. While Plotnick appears to have agreed that these changes would not
lead to "quick and easy" fixes to her situation, she "was willing to give it some
time as long as [she] saw some progress." *Id.* at 130, PageID #134. As with all
previous meetings, discussions, and communications Plotnick had with DPS
employees and officials regarding her situation at Belmont, during the meeting she
neither discussed her medical condition, nor did she request any specific personal
accommodations. *Id.* at 133, PageID #135.

Then, on August 29, 2019, barely two days after the meeting regarding the
ESL program, Dr. Hill and Chicketti met with Plotnick again, this time in Dr. Hill's
office. Plotnick Dep. at 134, Doc. #24 at PageID #135. As she had done with the

6

staff meeting, Plotnick used her phone to secretly record their discussion. *Id.* at 136, PageID #135. The purpose of the meeting was for Dr. Hill to address a notification he received from DPS administration about Plotnick taking Family and Medical Leave Act ("FMLA") leave. Plotnick Dep. at Ex. 10, Doc. #24-1 at PageID #242. Neither Dr. Hill nor Chicketti were aware Plotnick would be taking FMLA leave. Plotnick Dep. at Ex. 10, Doc. #24-1 at PageID #242.

Because this leave request would impact the recently discussed plans for changing the Sheltered ELA and TESOL classes,[2] Dr. Hill asked Plotnick if, and why, she was taking FMLA leave. Plotnick Dep. at Ex. 10, Doc. #24-1 at PageID #242. By Plotnick's own admission, no one at DPS was aware of her medical condition or alleged disability prior to this conversation. Plotnick Dep. at 137, Doc. #24 at PageID #136. Plotnick's first response to Dr. Hill was that, "for [his] sake," she was unwilling to share her diagnosis in order "to protect him." *Id.* at 141, PageID #137; Ex. 10, Doc. #24-1 at PageID #242. Confused, Dr. Hill asked her again, *id.*, to which Plotnick responded that she was bipolar. *Id.* at 140–141, PageID #136–137; Ex. 10, Doc. #24-1 at PageID #242. According to Plotnick, her reason for not wanting to disclose the specifics of her condition was because "most supervisors don't want to know because it leaves them vulnerable" and makes them "feel like they have to be careful around [her]" to avoid the appearance of discrimination. *Id.* at 137–138, PageID #136; Ex. 10, Doc. #24-1 at

---

[2] Plotnick claims that this discussion was a threat to shutdown of the ESL program if she took FMLA leave. Plotnick Dep. at 216–17, PageID 155–56.

PageID #242. Also, Plotnick did not "think it was essential" for Dr. Hill to know about her medical condition, because Belmont and DPS were already making changes to improve her classroom situation, and she thought she wouldn't "need to take time off" with those changes. *Id.* at 138, PageID #136; *id.* at 142, PageID #137. After further discussion about leveling Plotnick's classes and providing her with the necessary textbooks, the meeting ended with Plotnick deciding she did not need to take FMLA leave. *Id.* at 146–147, PageID #138.

Following the meeting, there was some disagreement between DPS ESL administration (McKinney) and Belmont administration (Dr. Hill) about the appropriate class size for Plotnick. *See* Plotnick Dep. at 148, Doc. #24, PageID ##138-39, 149; *see also* Doc. #24-1 at PageID #243. However, despite that disagreement, Plotnick's class sizes were reduced, and her overall caseload was decreased by more than eighteen students. Doc. #24 at 152–53, PageID #139–40. Then, on September 2, 2019, Plotnick sent Chicketti an email asking for specific curriculum materials. Plotnick Dep. at Ex. 13, Doc. #24-1 at PageID #247. The request was approved, and Chicketti told Plotnick to reach out to Mrs. Russ to order the materials. *Id.* The email was sent to Plotnick's DPS email address, and while Plotnick did not dispute that the email was received, she did not recall receiving Chicketti's approval to order the curriculum and acknowledged that she never ordered anything. Plotnick Dep. at 154–155, Doc. #24 at PageID #140.

Despite failing to order textbooks after they were approved by Chicketti, and even though Plotnick would complain to McKinney about having insufficient books

or curriculum, Plotnick Dep., Ex. 17, Doc. #24-1 at PageID #256, she also told

McKinney that an individual at Belmont "ha[d] worked very hard with building

leadership to reduce my numbers as much as possible[,]" and that "[t]he overall

reduction in numbers has helped tremendously, as have the improved leveling and

the wonderful para[professional]." Plotnick Dep. at 156, Doc. #24 at PageID #140;

*id.*, Ex. 15, Doc. No. 24-1 at PageID #251. Plotnick also recognized that

individuals at Belmont had "worked really hard on [her] schedule and it's somewhat

less overwhelming[.]" *Id.*, Ex. 17, Doc. No. 24-1 at PageID #256. Further

conversation with McKinney showed that Plotnick thought Dr. Hill had

"antagonized" her by how he talked to her and "pressured [her] to disclose [her]

medical condition." Plotnick Dep. at 175–176, Doc. #24 at PageID #145.

During the week of September 24, and shortly after a conversation with

McKinney, Plotnick went to meet with Ms. Leo, the union representative at

Belmont, to ask about sick leave options she had under her contract. Plotnick Dep.

at 181–182, Doc. #24 at PageID #147. While Plotnick did not mention her bipolar

disorder, she discussed her concerns that she was worried her health condition

would impact her ability to continue working. *Id.* at 182-183, PageID #147.

Plotnick testified that at the time her doctor had not ordered her to resign, but

"thought it was a good idea." *Id.* at 183–184, PageID #147.[3] Plotnick also

---

[3] A separate concern on which Plotnick was seeking guidance was whether or not a doctor's note stating she needed to resign for her health would result in DPS reporting her to the Ohio Department of Education for breaking her contract and resigning after the start of the school year. Plotnick Dep. at 182–183, Doc. #24 at PageID #147.

testified she thought if she took a week off work, she might be able to keep teaching the rest of the school year. *Id.* at 186, PageID #148.

Because of her meeting with Ms. Leo, Plotnick missed a mandatory meeting she was supposed to attend that day. *Id.* at 187–188, PageID #148. When Dr. Hill asked about the mandatory meeting the following morning, and Plotnick told him she missed the meeting because she was talking with Ms. Leo, *id.* at 187–188, PageID #148, Dr. Hill responded, "[o]h, I see how it is…You went to the union." *Id.* From his tone, Plotnick believed Dr. Hill was mad she went to the union, *id.* at 188–191, PageID #148–149, so later that day she slipped a handwritten note under his office door to tell him her meeting was only about sick leave options in the union contract. *Id.* at 191–192, PageID #149.

Following her discussion with Ms. Leo, Plotnick took the following workweek off and was out of the school from September 30 to October 4, 2019. Plotnick Dep. at 185, Doc. #24 at PageID #148. During her week off, Plotnick met with McKinney and David Romick, the Union President. *Id.* at 192, PageID #149. Plotnick shared her alleged concerns that Dr. Hill forced her to disclose her medical diagnosis and "talked [her] out of an FMLA claim." *Id.* at 194–195, PageID #150.

Approximately a month after her week of leave, Plotnick submitted her voluntary resignation letter on November 8, effective November 12, 2019, to DPS Human Resources. Plotnick Dep. at Ex. 1, Doc. #24-1 at PageID #191. In her letter, Plotnick stated the reason she resigned was that she "cannot continue in [her] position due to ongoing illness." Plotnick Dep. at 10, Doc. #24 at PageID

#104; Ex. 1, Doc. #24-1 at PageID #191. Separate from her letter, Plotnick stated that her doctor "strongly recommended" she that resign as "he felt the only way to protect her health" was to do so. Plotnick Dep. at 202, Doc. #24 at PageID #152. Prior to submitting her resignation letter, Plotnick did not inform anyone at DPS or Belmont, including Dr. Hill and Chicketti, that she was contemplating resigning, *id.* at 206, PageID #153, nor did she make any additional requests for support or accommodations prior to her resignation. *Id.* at 203, PageID #152.

### III.  Legal Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous

11

allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe; credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, Federal Practice and Procedure § 2726 (3d ed. 1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for

12

some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). If it so chooses, however, a court may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

### IV. Legal Analysis

As a threshold matter, for Plotnick to establish a *prima facie* case for failure to accommodate, she must first show that:

> "(1) she is disabled within the meaning of the [ADA]; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation."

*Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011) (citation omitted). "To prevail on a failure-to-accommodate claim under the ADA, an employee must show that [s]he *actually requested* an accommodation." *Green v. BakeMark USA, LLC*, 683 F. App'x 486, 493 (6th Cir. 2017) (citing *Johnson*, 443 F. App'x at 982-83) (emphasis added). "The initial burden of requesting an accommodation rests with the employee [because] '[t]he employer is not required to speculate as to the extent of . . . the employee's need or desire for an accommodation.'" *Id*. at 493–94 (quoting *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998)). Additionally, "in requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability." *Deister v. Auto Club Ins. Ass'n*,

13

647 F. App'x 652, 658 (6th Cir. 2016) (citing *Stanciel v. Donahoe*, 570 F. App'x

578, 583 (6th Cir. 2014)). Once a plaintiff establishes a prima facie case, the

burden shifts to the employer to demonstrate that any particular accommodation

would impose an undue hardship on the employer. *Johnson*, 443 F. App'x at 983

(citation omitted). If plaintiff fails at showing a *prima facie* case of disability

discrimination, the court does not need "to address the question of reasonable

accommodation." *Gaines v. Runyon*, F.3d 1171, 1176 (6th Cir. 1997) (citing

*Jasany v. United States Postal Service*, 755 F.2d 1244, 1250 (6th Cir.1985)).

Based on the parties' filings, the first two elements of the failure to

accommodate test are not in dispute: Plotnick had a disability within the meaning

of the ADA, namely her bipolar diagnosis, and she is otherwise qualified for both

the TESOL position she was initially hired for and the Sheltered ELA role she ended

up filling. Thus, Plotnick's ability to make her *prima facie* claim hinges on the final

three elements of the failure to accommodate test, namely that DPS and Belmont

knew or had reason to know about her disability, that she requested an

accommodation because of her disability, and that DPS and Belmont failed to

provide her with the accommodation she requested. *See Johnson*, 443 F. App'x at

982-83. Considering the materials cited by the parties as a part of the motion for

summary judgment, and a review of the entire Record, the Court concludes that

Plotnick has not shown a *prima facia* case of discrimination and retaliation under

the ADA.

Regarding the third element, Plotnick asserts that DPS allegedly knew or had

14

reason to know about Plotnick's disability due to, among other things, Dr. Hill "forc[ing her] to disclose [her] disability." Plotnick Dep. at 194–95, Doc. #24, PageID #150. Despite Plotnick's continued silence on her disability from the hiring stage all the way through the end of August, the parties do not dispute that Dr. Hill and Chicketti actually learned that Plotnick was bipolar during their meeting on August 29, 2019. Plotnick Dep. At 140–41, Doc. #24, PageID #136–37, Ex. 10, Doc. #24-1, PageID #242. While Plotnick's later conversations with McKinney and union president David Romick indicate that she never intended to share her disability diagnosis with DPS or Belmont officials, *see* Plotnick Dep. at 192–95, Doc. #24, PageID #149–50; *id.*, Ex. 19, Doc. #24-1, PageID #259, that does not affect the fact that Dr. Hill and Chicketti came into actual knowledge of it, which is all that is required for the third element. Thus, Plotnick's employer knew about her disability.

Getting to the fourth element, it is here that Plotnick's case breaks down. As previously stated, proving a failure to accommodate claim requires that Plotnick show that she "*actually requested* an accommodation," *Green*, 683 F. App'x at 493 (emphasis added), because it is not DPS or Belmont's responsibility to "speculate as to the extent of … [Plotnick's] need or desire for an accommodation," *Gantt*, 143, F.3d at 1046–47, nor is it their responsibility to begin working to accommodate Plotnick when she has not "provide[d] the[m] … with a sufficient basis to understand that the request is being made because of [her] disability." *See Deister*, 647 F. App'x at 658.

Based on the information before the Court, it is apparent that Plotnick did not provide DPS or Belmont with a "sufficient basis" to understand that her continued requests for resources and classroom leveling were necessary accommodations for her disability. From around the first week of her work at Belmont, Plotnick was making requests through both McKinney and Chicketti for assistance in changing curriculum and the composition of her classes, Plotnick Dep. at 76, 79, 81–82, Doc. #24 at PageID ##120–22, but none of those requests included a statement that the accommodations were being requested because of her bipolar diagnosis. From both her explicit statements to DPS employees and the circumstances of her discussions with DPS and Belmont staff, those persons would readily understand her requests to be only related to improving the educational environment for her students. She returned textbooks because they were too advanced for her students, *id.* at 76, 79, PageID ##120–21, and she discussed her curriculum issues with Chicketti without connecting it to her disability. *Id.* at 81–82, PageID #122. She reached out to McKinney for assistance with additional resources and to describe the vast disparities in student competencies within each of her classes. *Id.* at 91, PageID #124; Ex. 8, Doc. #24-1 at PageID ##230–32. Then, when Plotnick came under scrutiny for bringing up her issues with McKinney instead of going through Dr. Hill and Chicketti, she again only mentioned issues with the specific classroom environment, class leveling, curriculum and textbook availability, and overall student caseload, all without connecting them to her disability. Plotnick Dep. at 110–18, Doc. #24 at PageID

16

#129–31. Her statement to Chicketti about potentially being hospitalized was a one-off made without any context that would connect it to a potential disability requiring accommodations by the school. *Id.* at 122–23, PageID #132. Then, during the August 27 meeting between the Belmont administration, TESOL instructors, and school counselors, the only topics discussed were how to implement the school's next steps in leveling the ESL students between Plotnick's classes, hiring a paraprofessional, and "getting it right." *Id.* at 126–34, PageID ##133–35. Plotnick's disability was not discussed. *Id.* at 133, PageID #135.

Plotnick states that her August 29 discussion with Dr. Hill and Chicketti about her request for accommodations was both because of her disability and for the wellbeing of the students; Plotnick Dep. at 139–40, Doc. #24, PageID #136; however, she also admitted that she did not explicitly tell Dr. Hill or Chicketti that the reason she needed the changes to happen was because of her bipolar disorder. *Id.* Plotnick also admitted that, even if she were not bipolar, she probably would have sought the exact same changes simply for the betterment of the students. *Id.* Additionally, Plotnick's own testimony claims that she "wouldn't say [her disability disclosure] was voluntary" because she felt "a tremendous pressure to disclose." *Id.* at 140–41, Doc. #24, PageID ##136–37. Thus, based on the purported "involuntariness" of Plotnick's disability disclosure, as well as weeks of support requests she made without reference to any disability, it is apparent that the accommodations she was requesting were not associated with her bipolar

17

diagnosis in a way that provided a sufficient basis for DPS or Belmont to know that the two were interrelated.

However, even though DPS and Belmont were "not required to speculate as to the extent of . . . [Plotnick]'s need or desire for an accommodation[,]"*Gantt*, 143 F.3d at 1046–47, assuming arguendo that Plotnick's separate and disconnected statements about needing classroom support and being bipolar were sufficient to meet the requirements of a request for accommodation, *see Johnson*, 443 F. App'x at 982-83 and *Green*, 683 F. App'x at 493, she still fails to show that DPS and Belmont failed to accommodate her. After informing Dr. Hill and Chicketti about her disability, and being assured that changes would be made, Plotnick told them that she would not need to take FMLA. Plotnick Dep. at 141–42, Doc. #24, PageID #137; *id.* at 217, PageID #156. This shows, based entirely on Plotnick's representation of her request, that the desired or necessary accommodations she was seeking were *either* getting the requested changes to her classroom environment *or* taking FMLA leave. And, as shown in the information presently before the Court, DPS actually provided her with both.

Immediately after her face-to-face discussion with Dr. Hill and Chicketti on August 27 when they first became aware of her classroom needs—but not her disability—a meeting was scheduled with the TESOL teachers and school counselors to work out a way forward on rebalancing class schedules, teacher caseloads, and employing of a paraprofessional to help with Plotnick's situation. Plotnick Dep. at 126–34, Doc. #24 at PageID ##133–35. Plotnick's student

caseload immediately began to see a reduction, *id.* at 152–53, PageID ##139–40, and the times she mentioned that her caseload was still too high, DPS and Belmont worked to continue adjusting her class sizes. *Id.* When Plotnick informed Chicketti of the textbooks she needed, Chicketti approved the selection and told her to work with the curriculum personnel to order what was needed, though Plotnick never followed through on getting the textbooks. *Id.* at 153–55, PageID #140. Then, despite Plotnick's claims that she was threatened with the shutdown of the ESL program if she took FMLA leave, *id.* at 216–17, PageID 155–56, when she ended taking off a full week at the end of September, *id.* at 185–86, PageID #148; Ex. 18, Doc. #24-1, PageID #258, the program did not disappear and she returned to her classes after her leave. Ultimately, Plotnick voluntarily resigned at the beginning of November 2019, barely two months after Dr. Hill and Chicketti told her that changes were being made and that all parties involved in the changes "ha[d] to take our time and do it right," a statement with which she agreed. Plotnick Dep. at 129–30, Doc. #24, PageID 134. Thus, based on Plotnick's own presentation of how DPS personnel responded to her when she asked for changes or time off, her claims that DPS failed to accommodate are without merit.

Plotnick also claims that DPS and Belmont's failure to accommodate her classroom needs, in concert with Dr. Hill's reactions to her engagements with union personnel, amounted to retaliation by constructively terminating her. *See* Doc. #1, PageID #4; *see also* Doc. #32 at PageID #322, citing *Tomlinson v. Krauss-Maffei Corp.*, No. 21-6245m 2023 WL 1777389, at *10 (6th Cir. Feb. 6,

2023) ("Given the multiple meetings, discussions, email exchanges, and requests for medical leave contained in the record, a jury could determine that Plaintiff did make multiple requests that were in essence denied by Defendant."). "[C]onclusory statements are not sufficient to survive any motion for summary judgment," *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008). All of Plotnick's statements about Dr. Hill and Chicketti's supposed hostility towards her are conclusory and are not substantiated with anything other than her own perception and self-assessment. Without more, they cannot support her claim of retaliation via constructive termination due to intolerable working conditions related to her disability.

Additionally, despite Plotnick's attempts to favorably apply *Tomlinson*, a precedent originally cited by DPS in its motion for summary judgment, Doc. #27, PageID #296-97, to the facts of her case, such reframing is misplaced. First, *Tomlinson* was simply applying precedent laid out in *Talley v. Family Dollar Stores of Ohio, Inc. See* 542 F.3d 1099, 1109 (6th Cir. 2008). Second, *Talley* expressly acknowledged that it was not "pav[ing] the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability." *Id.* Thirdly, *Talley* also determined that "when an employee makes a *repeated* request for an accommodation and that request *is both denied and no other reasonable alternative is offered*, a jury may conclude that the employee's resignation was both intended and foreseeable." *Id.* (emphasis added).

With this context, both *Talley* and *Tomlinson* are unfavorable precedents for

20

Plotnick's claims. Again, assuming that DPS and Belmont were provided with a sufficient basis to know that Plotnick was requesting accommodations because of her disability, none of her requests were denied. At her request, her student caseload was adjusted, a papaprofessional "worth her weight in gold" was hired to support her, *see* Plotnick Dep. at 126, Doc. #24 at PageID #133, and she was approved to acquire new textbooks of her choosing, albeit on which she failed to follow through. Additionally, on the only two relevant times Plotnick asked for leave—namely the half day on August 27 and the full week bridging the months of September and October—she received approval. Even if Plotnick is arguing that her attempt to take FMLA leave around the end of August amounted to a denial, which is not apparent from the filings before the Court, by her own testimony she admitted that she agreed not to take that leave after the August 27 meeting, because DPS and Belmont agreed to make changes to improve her situation. Plotnick Dep. at 142 & 146, Doc. #24 at PageID ##137–38. Since there was not a history of "repeated request[s] for an accommodation" that were "denied [with] no other reasonable alternative … offered," Plotnick cannot argue that she was constructively terminated as retaliation. Accordingly, the Court SUSTAINS Defendants' Motion for Summary Judgment as to Counts One and Two.

As to Plotnick's third and final claim, a state law claim for disability discrimination, the Court declines to exercise supplemental jurisdiction over this state law claim without having independent federal subject matter jurisdiction over a civil claim making up a part of the same case or controversy. *See United Mine*

*Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (observing that supplemental jurisdiction is "a doctrine of discretion, not of plaintiff's right" and "[c]ertainly, if the federal claims are dismissed before trial, … the state claims should be dismissed as well"); *see also* 28 U.S.C. § 1367. Accordingly, the Court DISMISSES the third claim without prejudice to refiling in a state court of competent jurisdiction.

### V. Conclusion

For the reasons set forth above, the Court SUSTAINS Defendant's Motion for Summary Judgment as to Counts One and Two. Doc. #27. The Court declines to exercise supplemental jurisdiction on Count Three and dismisses same without prejudice to refiling in a state court of competent jurisdiction.

Judgement is to be entered in favor of Defendant and against Plaintiff. The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**Date:** November 21, 2023

WALTER H. RICE
UNITED STATES DISTRICT JUDGE